Samuel SALOMAA, Plaintiff,

v.

HONDA LONG TERM DISABILITY PLAN, and Erisa Plan, Does 1 Through 10, Inclusive, Defendants.

No. CV 06–0754 AG (FMOx).

United States District Court, C.D. California.

March 6, 2008.

Charles J. Fleishman, Charles J. Fleishman Law Offices, Beverly Hills, CA, for Plaintiff.

Melissa M. Cowan, Galton & Helm, Los Angeles, CA, for Defendants.

## *INTRODUCTION*

### ORDER AFFIRMING ADMINISTRATOR'S DENIAL OF LONG TERM DISABILITY BENEFITS

ANDREW J. GUILFORD, District Judge.

Plaintiff Samuel Salomaa ("Plaintiff") is a former employee of American Honda Motor Co., Inc. Mr. Salomaa filed this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. section 1001, et seq., seeking long-term disability ("LTD") benefits from the American Honda Welfare Benefits Plan (the "Plan") administered and insured by Life Insurance Company of North America ("LINA"). Plaintiff asserts that he suffers

from Chronic Fatigue Syndrome ("CFS"), rendering him unable to perform the duties of his occupation and entitling him to long-term disability ("LTD") benefits. Defendant American Honda Long–Term Disability Plan ("Defendant") asserts that Plaintiff is not entitled to LTD benefits because he failed to sufficiently substantiate the CFS diagnosis and the effect of that condition on his ability to work. The Court **AFFIRMS** LINA's decision to deny benefits to Plaintiff.

## *FINDINGS OF FACT*

After reviewing and evaluating all evidence in the administrative record, the Court makes the following findings of fact, including any findings of fact found in the Conclusions of Law.

### 1. THE PLAN

The Plan defines the eligibility requirements for receipt of LTD benefits, and provides that benefits are payable for an initial 24 month period upon a showing that an employee is unable to perform the duties of his or her "regular occupation." "Regular occupation" is defined as "the occupation the Employee routinely performs at the time the disability began ... as it is normally performed in the general labor market in the national economy." (Notice of Submissions of Administrative Record ("AR") 552.) After payment of benefits for 24 months, an employee may be eligible to receive disability benefits until age 65 if the inability to perform the duties of "any occupation" is established. (AR 529.) These terms are detailed in the Policy under the heading "Schedule of Benefits for Class 1."

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1. unable to perform the material duties of his or her Regular Occupations; and

2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:

1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and

2. unable to earn 80% or more of his or her Indexed Earnings.

The Insurance Company will require proof of earnings and continued Disability.

(AR 527.)

The Plan defines "sickness" as "any physical or mental illness," but the benefit period for disabilities related to mental illness, anxiety disorders, and depressive orders is limited to a single 24 month term. (AR 552, 544.) To receive benefits under the Plan, employees are required to demonstrate that they are under the care of a physician, were continuously and totally disabled during a 210–day "elimination period," and meet all other terms and conditions of the policy. (AR 528, 541, 620.)

### 2. PLAINTIFF'S CLAIMED DISABILITY

Before the onset of his claimed disability, Plaintiff worked as a Project Manager for Honda's E–Business division. (AR 439.) In seeking medical care Plaintiff described his job as extremely stressful, requiring him to work 12–hour shifts five days a week and consisting of an increasing number of responsibilities and duties. *Id.*

In October 2003, Plaintiff reported suffering from a severe flu-like illness that rendered him bedridden for three days.

(AR 116, 278.) Plaintiff asserts that it was after this illness that he began to experience severe fatigue. *Id.* In July 2004, Plaintiff was placed on short-term disability after being diagnosed with recurrent major depression by Dr. Donna Ehlers, a Board Certified Psychiatrist. (AR 90, 488, 499, 513.) Thereafter, Plaintiff regularly attended a mental health clinic. (AR 354, 496.) In October 2004, while still on short-term disability for depression, Plaintiff requested leave to seek a second opinion for his "ongoing severe fatigue and other symptoms." (AR 315, 319, 310, 354–55, 406.) A short time later, Plaintiff met with Dr. Floyd Andersen, a CFS specialist and founder of the Kaiser Permanente Chronic Fatigue/Fibromyalgia Clinic. (AR 403–05.) Dr. Andersen diagnosed Plaintiff as suffering from CFS. (AR 278.)

In December 2004, Dr. Ehlers sent a letter to LINA retracting her original diagnosis of depression and concurring with Dr. Andersen's diagnosis of CFS. (AR 354–55.) Dr. Ehlers explained that Plaintiff's "poor response to medication made it apparent that his symptoms were not related to an underlying depression." (AR 355.) Dr. Ehlers further stated that despite her original diagnosis, in her opinion Plaintiff "never suffered from Major Depression." *Id.*

### 3. PLAINTIFF'S APPLICATION FOR LONG–TERM BENEFITS

In January 2005, Plaintiff was approaching the seven-month limit for short-term disability leave and was advised by his employer to apply for LTD benefits under the Policy. (AR 392, 413.) In March 2005, Plaintiff completed a questionnaire requesting LTD benefits and citing CFS as the source of his permanent disability. (AR 358–63.) At around the same time, Dr. Andersen sent a letter to LINA supporting Plaintiff's application for LTD benefits. (AR 278.) In the letter, Dr. Andersen opined that Plaintiff "is totally disabled and would not be able to work even 30 minutes per day on a daily basis." *Id.*

### 4. LINA'S DENIAL OF PLAINTIFF'S CLAIM

In April 2005 LINA denied Plaintiff's claim for LTD benefits, stating that his application for long term disability was not supported by the medical evidence. (AR 230–32.)

> In conclusion, we have normal findings such as repeated essentially normal clinical physical exams.... There are normal clinical laboratory studies and essentially negative cardiac studies. Thyroid, calcium, albumin, serum lytes and CBC results were normal. There are no positive findings of repeated infections, fevers, rashes or unexplained weight loss. No specific serial descriptions of appearance or physical signs consistent with Chronic Fatigue Syndrome exist. Under generally accepted medical standards, one would not expect to see this constellation of normal findings and lack of positive findings in a condition such as Chronic Fatigue Syndrome where the reported severity is incapacitating.

(AR 231–32.)

After this initial denial Plaintiff submitted additional information, including excerpts from a personal journal that Plaintiff had been keeping and another letter from Dr. Andersen. (AR 254–267, 225). In the letter, Dr. Andersen explained that with CFS "laboratory tests are always normal and there is no test that is available at the present time for chronic fatigue syndrome." (AR 225.) After reviewing Plaintiff's supplementation, LINA reaffirmed its denial of Plaintiff's claim for lack of medical evidence to support a determination of long term disability. (AR 189.) In an accompanying letter, LINA commented on Plaintiffs supplementation.

Your daily journals on file report that you drive for one half-and-hour to one hour to Home Depot, and at times, you drive one hour to pick up your children at their school. The daily activities reported in your daily journals are inconsistent with the aforementioned restrictions and limitations reported by Dr. Andersen since the daily activities reported in your daily journal do show that you are able to work more than thirty minutes per day.

(AR 188.)

After this denial, Dr. Andersen wrote yet a third letter to LINA, contesting LINA's determination and again stating that "there are no physical findings for chronic fatigue syndrome except the patient appears fatigued." (AR 195.) According to Dr. Andersen, the last time that he saw Plaintiff, Plaintiff was unable to sit up under his own power and needed a wheelchair to get to the exam room. (AR 196.) Dr. Andersen opined that Plaintiff's condition was so bad that he believed Plaintiff "would not be able to work even five minutes a day because of his severe fatigue." *Id.*

In July 2005, LINA again sent Plaintiff a denial letter, this time responding to Dr. Andersen's recent letter. LINA's denial emphasized the lack of objective evidence that Plaintiff suffered from CFS, noting that Dr. Andersen "made no specific mention of substantial impairment of cognitive function, sore throat, current infection, tender lymph nodes, specific myalgia or arthralgia, or new onset of headache or post-exertion fatigue," and made "no mention of new positive lab findings that may be supportive of the etiology of Chronic Fatigue Syndrome." (AR 185.) The denial letter also pointed out that even according to Dr. Andersen, "[Plaintiff's] limitations of physical functional capacity were based entirely upon self report." (*Id.*)

## 5. PLAINTIFF'S APPEAL

In August 2005, Plaintiff formally appealed the denial of his application for LTD benefits. (AR 179.) While Plaintiff's appeal was pending, Plaintiff's counsel requested information regarding the earlier denials and asked if there were any tests that Plaintiff "should undergo in order to satisfy [LINA] of [Plaintiff's] disability" (AR 168.) LINA did not directly respond to Plaintiff's query, but during the pendency of his appeal Plaintiff visited another CFS specialist, Dr. Benjamin Natelson. (AR 113.) After this visit, Dr. Natelson diagnosed Plaintiff with CFS and also wrote a letter to LINA confirming Dr. Andersen's CFS diagnosis and stating that "[Plaintiff] fulfills the case definition for chronic fatigue syndrome." (AR 114.)

Dr. Natelson referred Plaintiff for a neuropsychological exam. (AR 116–28.) An evaluation based on the findings of that exam was issued in November 2005, and stated that "[b]ased on the clinical interview and self-report questionnaires that were administered, there [was] no evidence that [Plaintiff] suffers from significant mood or psychotic disorders.... The findings of [the] evaluations suggest with a reasonable degree of neurospychological certainty that [Plaintiff's] cognitive problems are related to his" CFS. (AR 126.) The report went on to state that Plaintiff's "neuropsychological profile is consistent with reports in the literature that identify slowed processing speed and decreased mental efficiency (the ability to process multiple pieces of information at one time) as the hallmark cognitive symptoms of CFS ...." (*Id.*) Besides submitting the results of the neuropsychological exam to LINA, Plaintiff also submitted letters from family members and a former Honda supervisor, attesting to Plaintiff's credibility and condition. (AR 153–56, 157–59, 272–74.)

In January 2006, while his appeal was pending, Plaintiff was notified that he had been awarded Social Security Disability benefits. (AR 97–103.) Plaintiff notified LINA of this decision.

In February 2006, LINA denied Plaintiff's appeal, citing a lack of medical documentation that Plaintiff is afflicted by CFS or that he is unable to perform the duties of his occupation. (AR 89–93.)

> The multiple laboratory studies in [Plaintiff's] file are all remarkable for being normal. During that time period of July 24, 2004 thru February 20, 2005, his exams, except for postural pulse and blood pressure variations are also normal. The orthostatic findings were unaccompanied by loss of consciousness. Although [Plaintiff] originally claimed he was unable to perform his occupation due to depression, there is no documentation on filed on any significant physical, cognitive or psychological limitations and/or significant clinically measured functional deficits in those areas during the period in question. The additional submitted information mainly summarizes previous records already on file. Although the neuropsychological testing of November 7, 2005 shows some abnormalities, it does not support that those deficits were present during the elimination period.

(AR 90.)

## CONCLUSIONS OF LAW

The Court makes these conclusions of law, including any conclusions of law found in the Findings of Fact.

## 1. LINA'S DENIAL OF BENEFITS IS REVIEWED FOR ABUSE OF DISCRETION

 This case turns on the standard of review applied to LINA's denial of Plaintiff's application for LTD benefits. The review of a plan administrator's denial of benefits is *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 511 F.3d 1206, 1209 (9th Cir.2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Where the plan grants such discretionary authority, the administrator's decision is reviewed for abuse of discretion. *See id.* An ERISA plan administrator's decision to deny benefits is an abuse of discretion "only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bell*, 410 F.3d 1173, 1178 (9th Cir.2005); *see also Taft v. Equitable Life Assurance*, 9 F.3d 1469, 1473 (9th Cir.1993). Under the abuse of discretion standard, "even decisions contrary to evidence in the record do not necessarily amount to an abuse of discretion," so long as there is some reasonable basis for the decision. *See Taft*, 9 F.3d at 1473; *see also Horan v. Kaiser Steel Retirement Plan*, 947 F.2d 1412, 1417 (9th Cir.1991).

In this case, the parties agree that the Plan gives LINA the requisite discretionary authority, and thus the Court reviews the denial of Plaintiff's disability benefits under an abuse of discretion standard. (Plaintiff's Reply Brief 18:22–23; Defendant's Opening Brief 14:27–28.) But this does not end the Court's inquiry regarding the appropriate standard of review, because in ERISA benefits cases the precise nature of the abuse of discretion standard varies depending on the existence and extent of a conflict of interest.

The effect of a conflict of interest on the applicable standard of judicial review was addressed in *Abatie v. Alta Health & Life Insurance Company*, where the Ninth Circuit held that if a plan administrator operated under a conflict of interest when de-

nying benefits to a beneficiary, a court's abuse of discretion review should be "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." *Abatie,* 458 F.3d 955, 963 (9th Cir.2006) (en banc) (following *Firestone Tire,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80). The common situation where "an insurer acts as both the plan administrator and the funding source for benefits" has been described as a "structural conflict of interest." *Id.* at 965–66 (noting that in such a situation the administrator's responsibility to see that those deserving benefits receive them is in inherent conflict with the desire to maximize profits by paying as little in benefits as possible). A structural conflict of interest, "even if merely formal and unaccompanied by indicia of bad faith or self-dealing, ought to have some effect on judicial review." *Id.* at 966. To determine how much effect a structural conflict of interest should have on judicial review, the *Abatie* Court discussed in detail the factors a court might consider to "tailor its review to all the circumstances before it."

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Id.* at 968–69 (citations omitted).

In the Ninth Circuit, "[t]he degree of deference [courts] afford to a claims administrator's decision can vary significantly" depending on the evidence presented. *Saffon,* 511 F.3d at 1211.

One indication of potential conflict cited by Plaintiff is LINA's failure to engage in meaningful communication during the review process. ERISA regulations require a "meaningful dialogue" between the claims administrator and the beneficiary, such that the beneficiary is kept informed of additional material or information necessary to "perfect the claim." *See Booton v. Lockheed Medical Benefit Plan,* 110 F.3d 1461, 1463 (9th Cir.1997); *see also* 29 C.F.R. § 2560.503–1(g). LINA's failure to clearly inform Plaintiff of medical tests that it would consider relevant to a diagnosis of CFS evidences an absence of meaningful dialogue. For example, in this litigation LINA has argued that Plaintiff fails to support a diagnosis of CFS in part because of the absence of "objective test results." (Defendant's Opening Brief 18:18–20.) Specifically, LINA notes that Plaintiff "did not have a SPECT scan." (*Id.* at 18:19–20.) But at no point during the processing of Plaintiff's claim did LINA ever request that a SPECT scan or any other specific tests or procedures be performed, despite its right to request such testing under the terms of the Plan. (AR 527.) Having opted not to request that procedures such as the SPECT scan be performed before deciding to deny benefits to Plaintiff, LINA's present reliance on the absence of such "objective test results" indicates evasiveness during the review process, and a conflict of interest.

Other evidence cited by Plaintiff as proof of LINA's conflict of interest is less convincing. For example, Plaintiff claims that LINA violated ERISA procedural regulations by failing to decide the administrative appeal in a timely fashion. (Plaintiffs Opening Brief 17:8–15.) But a close examination shows that Plaintiff's de-

cision to prevent LINA from directly contacting his treating physician was at least partially responsible for the delay. In a letter dated December 29, 2005, Plaintiff's counsel informed LINA that because he did not "trust" its representatives "to record telephone conversations honestly," Dr. Andersen had been instructed "not to speak about [Plaintiff's] condition to anyone on the phone" and all questions for Dr. Andersen "should be put in writing and sent to [Plaintiff's counsel]." (AR 105.) Plaintiff was informed that the appeals period would be tolled pending Plaintiff's submission of information. (AR 108–109.)

Plaintiff also argues that LINA's decision to file surveillance footage with the Court is evidence of a conflict of interest. During litigation, LINA "conducted several days of surveillance of [Plaintiff's] activities" and filed the surveillance video with the Court for consideration if a *de novo* standard of review were applied, in which case evidence outside the administrative record can be considered. (Defendant's Opening Brief 20:1–19.) Plaintiff has argued that LINA's "post-denial search for evidence to support its denial of benefits was evidence of bad faith," because this surveillance occurred after the Plan's elimination period had ended. (Plaintiff's Reply Brief 20:4–17.) The Court disagrees, and finds the surveillance video relevant without reference to the 210–day elimination period. Under the Plan, benefits can be terminated on "the date the Insurance Company determines [the employee] is not Disabled." (AR 545.) Thus, the surveillance video is relevant to the ongoing requirement that Plaintiff be disabled to receive disability benefits, and LINA did not act in bad faith by submitting this evidence for consideration in the event that the Court applied *de novo* review.

In response to Plaintiff's evidence of a conflict of interest, LINA has presented rebuttal evidence, including evidence that it does not provide its plan-administrator employees with any incentive to deny claims. (Defendant's Supplemental Kojima Declaration.) Such affirmative evidence that any conflict of interest did not influence the decision to deny Plaintiff's benefits "is helpful to determining" whether an abuse of discretion has occurred. *See Abatie,* 458 F.3d at 969.

Plaintiff has presented evidence that LINA's conflict of interest went beyond the "inherent" conflict that exists any time a plan administrator both funds and administers a plan, and LINA has offered some evidence in rebuttal. The Court considers all the evidence for and against a conflict of interest, and application of the abuse of discretion standard in this case is thus "tempered by skepticism commensurate" with that evidence. *See Abatie,* 458 F.3d at 959; *see also Saffon,* 511 F.3d at 1211–12 (noting that a court should "discount" the deference given a plan administrator's decision to deny benefits to the extent that the decision was influenced by a conflict of interest).

## 2. PRELIMINARY FINDINGS

■ Preliminarily, the Court agrees with Plaintiff that the provisions governing this case are those found in the Policy itself, and not in the Summary Plan Description ("SPD"). In this litigation, LINA has relied on language in the SPD requiring that beneficiaries produce "objective medical evidence" supporting their claim for benefits. But as Plaintiff points out, during the review process "not one single letter from [LINA] mention[ed] the provision of the SPD that [LINA's] lawyers now write about," and LINA never referenced the SPD as a rationale for the denial of benefits. (Plaintiff's Reply Brief 4:22–28.) Further, the "objective medical evidence" requirement of the SPD is not consistent with the terms of the Policy.

The Ninth Circuit has addressed situations where the SPD conflicts with primary ERISA plan documents, and found that in this circumstance the provisions of the primary documents control. *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1145 (9th Cir. 2002) (addressing conflict created when ERISA "plan master document unambiguously qualifies an employee as a member of the retirement plan, but the SPD unambiguously excludes him"). The *Bergt* court identified two important rationales in holding that the SPD should be disregarded when it conflicts with primary plan documents. First, the *Bergt* court determined that "it would be unfair to have the employees bear the burden of a conflicting SPD and plan master document and, thus ... the provision *more favorable* to the employee" should control. *Bergt*, 293 F.3d at 1145 (emphasis original) (citing *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1518–19 (10th Cir.1996); *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907–08 (2d Cir.1990)). Second, the *Bergt* court found that because the purpose of the SPD is to "simply summarize the relevant portion of the plan master document," any burden of uncertainty created by inaccurate drafting should be placed on the drafting party, and not on individual employees.

In this case, the Policy defines "sickness" broadly to include "any physical or mental illness." (AR 552.) The SPD, however, restricts the Policy's broad definition by requiring that a claim for benefits be "supported by objective medical evidence provided by a physician." (AR 552, 621.) While this disparity does not create the type of direct contradiction addressed in *Bergt*, it raises similar issues because the addition of the "objective medical evidence" provision modifies the definition of a qualifying "sickness" as the term is defined in the Policy. An employee is entitled to rely on the Policy as including all information relevant to benefits coverage, and additional restrictions on coverage which appear only in the SPD place an improper burden on employees. In such situations the provision more favorable to the employee will govern. *See Bergt*, 293 F.3d at 1145.

Finding the Policy's definition of a qualifying "sickness" controlling, the Court disregards the "objective medical evidence" requirement of the SPD in reviewing the denial of benefits. This does not mean that LINA's scrutiny of the degree to which Plaintiff supported his application for benefits with objective evidence is improper per se, but only that the SPD is not a legitimate basis for such scrutiny.

### 3. LINA DID NOT ABUSE ITS DISCRETION IN DENYING BENEFITS

■ To qualify for LTD benefits under the Plan, employees are not only required to establish that they suffer from a sickness or injury, but also that this sickness or injury prevents them from performing the material duties of their occupation such that they are "totally disabled." (AR 527, 552.) Because both of these elements must be established, benefits may rightfully be denied in this case solely on the basis that Plaintiff has not shown that he is totally disabled, even if he has established that he suffers from CFS. The Court finds that, even reviewing the decision to deny benefits under the diminished degree of deference required by LINA's conflict of interest, it was not an abuse of discretion for LINA to determine that Plaintiff did not adequately establish total disability. The Court thus affirms the denial of Plaintiffs LTD benefits.

### 3.1 LINA Did Not Abuse Its Discretion By Requesting Objective Evidence of Plaintiff's Total Disability

■ Throughout the claims review process, LINA consistently denied Plaintiffs

application for benefits on two grounds: (1) an insufficient showing that Plaintiff suffered from CFS, and (2) an insufficient showing that Plaintiff's health problems rendered him incapable of performing the duties of his occupation. (AR 231 ("However, you stated no physical reasons as to why you are unable to work"); AR 90 ("Although [Plaintiff] originally claimed he was unable to perform his occupation due to depression, there is no documentation on filed on any significant physical, cognitive or psychological limitations and/or significant clinically measured functional deficits in those areas during the period in question").) The Court does not rule here on whether, as a general rule, it is an abuse of discretion for a plan administrator to deny benefits when an employee cannot establish CFS with a showing of objective medical evidence. The value of objective testing in diagnoses of CFS poses difficult questions, and this case is not well-suited for judicial determination of the issue. But the Court does affirm a plan administrator's right to require objective evidence that employees are totally disabled by the medical condition which afflicts them, regardless the condition at issue.

The distinction between a medical condition and the effect of that condition on an employee's ability to perform occupational duties is well established. *See Denmark v. Liberty Life Assurance Co. of Boston,* 481 F.3d 16, 37 (1st Cir.2007) (recognizing a distinction between "requiring objective evidence of the diagnosis, which is impermissible for a condition … that does not lend itself to objective verification, and requiring objective evidence that the plaintiff is unable to work, which is allowed."); *Corry v. Liberty Life Assurance Co. of Boston,* 499 F.3d 389, 401 (5th Cir.2007) (finding administrator's actions proper where it accepted diagnosis of fibromyalgia, but did not accept claim of disabling effects of the condition); *Fitzpatrick v.*

*Bayer Corp.,* No. 04 Civ. 5134, 2008 WL 169318, at *11, 2008 U.S. Dist. LEXIS 3532, at *34 (S.D.N.Y. Jan. 17, 2008) ("[T]he operative question in this case is not whether Plaintiff actually suffered from CFS and/or fibromyalgia, but instead whether the Plaintiff's CFS and/or fibromyalgia rendered her 'totally disabled' … and thus unable to work."). Plaintiff relies heavily on cases including *Cook v. Liberty Life,* 320 F.3d 11, 21 (1st Cir.2003), for the proposition that "CFS is not an illness that can be diagnosed with objective laboratory testing or any other type of objective testing." (Plaintiffs Opening Brief 6:17–24.) But after *Cook,* the First Circuit explicitly acknowledged the distinction between establishing a medical condition and establishing the effects of that condition: "[W]hile the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illness do lend themselves to objective analysis." *Denmark,* 481 F.3d at 37 (quoting *Boardman v. Prudential Ins. Co. of America,* 337 F.3d 9, 17 n. 5 (1st Cir.2003)). Thus even the caselaw cited by Plaintiff acknowledges the distinction between sickness and disability.

A plan administrator does not act improperly by distinguishing between a medical condition and the extent of the disability resulting from that condition. Thus, even reviewing LINA's actions with diminished deference proportionate to its conflict of interest, the Court holds that LINA did not abuse its discretion by requiring objective evidence that CFS precluded Plaintiff from performing the duties of his regular occupation.

### 3.2 LINA Did Not Ignore the Opinions of Plaintiffs Medical Experts

Plaintiff contends that LINA abused its discretion in denying his application for

LTD benefits because it "rel[ied] on a file review by an employee doctor and disregard[ed] the opinion of treating and examining doctors." (Plaintiffs Opening Brief 15:5–14.) The Court disagrees with Plaintiff and finds that LINA did not ignore Plaintiff's medical opinions, but analyzed them and found them to lack of objective evidence of total disability determinative.

A consistent refrain throughout LINA's processing of Plaintiff's application for LTD benefits was concern that the conclusions and opinions of Plaintiff's treating physicians relied exclusively on Plaintiff's self-reported symptoms, and thus lacked objectivity. At the time Plaintiff's application for benefits was initially denied, LINA stated that "the documented physical limitations do not support the physical restrictions stated by Dr. Andersen...." (AR 232.) In the May 20, 2005 letter affirming the denial of benefits, LINA emphasized that even according to Plaintiff's physician, "there are no physical findings that are positive with respect to your reported condition and ... the physical limitations and restrictions he reported are based entirely on self-report by you." (AR 189.) And finally, in the February 14, 2006 denial of Plaintiff's appeal, LINA noted that "[t]he presence of a condition, diagnosis or treatment does not equate [with] disability under this policy" and Plaintiff's file did not contain documentation "of any significant physical, cognitive or psychological limitations and/or significant clinically measure functional deficits...." (AR 90.)

It is clear from these letters that LINA did not ignore or disregard the opinions and diagnoses of Plaintiff's medical experts, but reviewed them and found them lacking. In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), the United States Supreme Court held that in ERISA cases an administrator is not required to blindly accept a treating physician's opinions and

diagnosis. *Id.* at 825, 123 S.Ct. 1965 ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician...."). That LINA was not required to adopt the treating physician's opinions and recommendations in this case is further supported by the fact that "a medical diagnosis does not by itself establish a disability." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir.2004).

Ultimately, the Court finds that LINA did not abuse its discretion in determining that the reports submitted by Plaintiff's medical experts lacked sufficient objective evidence to establish total disability. A review of the opinions submitted by Dr. Andersen, who initially diagnosed Plaintiff with CFS, show an unquestioning reliance on Plaintiff's self-reported symptoms. The letters LINA received from Dr. Andersen are filled with statements that begin, "[Plaintiff] states" or "[Plaintiff] estimates." (AR 225.) And even when Dr. Andersen did not directly attribute statements regarding Plaintiff's physical condition to Plaintiff himself, it is clear that self-reporting occurred. For example, in a letter dated April 29, 2005, Dr. Andersen asserted that Plaintiff was unable to play kickball with his children, was unable to wash his car, and that trips to visit the doctor required Plaintiff to "rest up for a day or 2 before his appointment and [be] in bed for 1 to 2 days after making the trip." (AR 225.) In a letter dated June 13, 2006, Dr. Andersen gave a detailed description of Plaintiff's eating habits, noting that "he was too fatigued to come to the breakfast table or come to the table for lunch" and is able to come to supper for only 5 to 10 minutes before he must "go back to bed or lay his head on the table." (AR 196.) Surely Dr. Andersen did not personally observe these alleged physical effects of Plaintiffs condition, but instead

relied on Plaintiff's self-report of the symptoms. This reliance on Plaintiff's self-reporting was confirmed by Dr. Andersen himself, who conceded that "the physical limitations and restrictions in this claimant are based entirely upon self-report by the claimant." (AR 212.)

The opinions provided by Dr. Natelson are also replete with Plaintiff's self-reporting. In October 2005 Plaintiff was examined by Dr. Natelson, a CFS expert at the New Jersey Medical School, and Dr. Natelson subsequently sent a letter to LINA summarizing his opinion of Plaintiff's condition. (AR 113–114.) Dr. Natelson offered the opinion that Plaintiff suffered from a disabling "combination of CFS and severe stress sensitivity" rendering him "100% disabled." (AR 113.) The letter confirmed that, with a few exceptions, Plaintiff's "laboratory tests were within normal limits," and "[p]ast medical history is essentially negative as is review of systems." Dr. Natelson's opinion thus appears to be based primarily on the Plaintiff's self-report of "activity levels [ ] only 35% of what they had been prior to his illness onset," "unrefreshing sleep" and other "symptoms at substantial or severe intensity." (AR 113.) Dr. Natelson's letter concluded by stating that "[m]oreover, [Plaintiff] told me that simply carrying his wife's briefcase for approximately 5 minutes was sufficient to make him feel substantially more ill than he had been prior to doing this." (Id.)

In reviewing the opinions and diagnoses of Dr. Andersen and Dr. Natelson, it was not an abuse of discretion for LINA to be skeptical and to discount their value to the degree they were based almost exclusively on acceptance of Plaintiff's self-reported and subjective complaints. Plaintiff argues that he should not be punished for taking an active and involved role in his own health care, and attempting to "help the doctors cure his condition." (Plaintiff's Reply Brief 8:21–9:4.) But when self-reported symptoms are accompanied by financial incentive in the form of disability benefits, a plan administrator is entitled to be wary. Accepting self-reported symptoms at face value is "more or less required of treating physicians, but by no means required of the administrator." *Maniatty v. Unumprovident Corp.*, 218 F.Supp.2d 500, 504 (S.D.N.Y.2002), *aff'd* 62 Fed.Appx. 413 (2d Cir.2003).

### 3.3 LINA Did Not Fail to Consult Qualified Experts

Plaintiff criticizes LINA for failing to consult medical personnel with sufficient expertise specific to CFS. (Plaintiff's Opening Brief 14:19–15:4.) LINA responds by arguing that under Plaintiff's position, reviewing doctors would be required to possess an unrealistic degree of specialization, and that LINA's experts were in fact qualified to review Plaintiff's application for LTD benefits. The Court agrees with LINA.

Plaintiff's application was reviewed by Dr. Manolakas and Dr. Mendez. Dr. Manolakas's curriculum vitae, which is included in the administrative record, shows that he is certified by the American Board of Physical and Rehabilitation Medicine and the American Board of Pain Medicine, is a qualified medical examiner for the State of California, and is licensed to practice medicine in seven states. (AR 519–520.) Dr. Mendez is certified by the American Board of Internal Medicine and the American Board of Preventive Medicine, is both a qualified medical examiner and an independent medical examiner for the State of California. (AR 516–517.) ERISA regulations require that a claim be reviewed by "a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. 2560.503–1(h)(3)(iii).

But this regulation is not so demanding that it requires plan administrators to retain an expert specific to every unique condition or disease that an beneficiary may claim. More specifically, courts have found that doctors trained in internal medicine or occupational medicine, as are Dr. Manokalas and Dr. Mendez, are "sufficiently qualified to judge" the extent of disability in cases involving CFS. *See Fitzpatrick,* 2008 WL 169318, at \*14, 2008 U.S. Dist. LEXIS 3532, \*44 (citing *Lee v. Aetna Life and Cas. Ins. Co.,* No. 05 Civ. 2950, 2007 WL 1541009, at \*4, 2007 U.S. Dist. LEXIS 38205 (S.D.N.Y. May 24, 2007)).

### 3.4 LINA Did Not Ignore Other Important Evidence

Finally, Plaintiff argues that LINA abused its discretion by failing to give weight to the Social Security determination made in Plaintiff's favor, and the results of neuropsychological tests performed on Plaintiff. The Court has considered this evidence, and does not find LINA's review to be faulty.

In January 2006, while Plaintiff's appeal was pending, the Social Security Administration awarded him disability benefits. (AR 97–103.) Plaintiff contends that LINA "ignored the finding that plaintiff was totally disabled under the Social Security test," and "[i]gnoring that a claimant is totally disabled for Social Security purposes is evidence of an arbitrary and capricious decision." (Plaintiff's Opening Brief 19:6–19.) While a Social Security decision is evidence that may be considered by a plan administrator, it is certainly not binding. A major distinction between disability determinations made by the Social Security Administration and those of a plan administrator is the degree of deference given to the treating physician. In Social Security cases, the "treating physician rule" requires that great weight be given to "opinions from ... treating sources," and mandates that a reviewer "give good

reasons ... for the weight [accorded to the] treating source's opinion." *Black & Decker,* 538 U.S. at 829, 123 S.Ct. 1965 (citing 20 CFR §§ 404.1527(d)(2), 416.927(d)(2)). But the treating physician rule has been expressly disavowed in ERISA cases. *See Black & Decker,* 538 U.S. at 833, 123 S.Ct. 1965 ("[C]ritical differences between the Social Security disability program and ERISA benefit plans caution against importing a treating physician rule from the former area into the latter."). This distinction between the process of review in ERISA cases and that of Social Security cases is especially germane in a case like this one, where the plan administrator has declined to adopt the opinion of the treating physician because it believes that the opinion is primarily the result of self-reporting. Requiring LINA to rely on the Social Security determination in this case would indirectly require LINA to rely on the opinions of Plaintiff's treating physicians. The Court does not impose this requirement on LINA, and thus finds that LINA did not abuse its discretion in its treatment of the Social Security determination.

Plaintiff also contends that LINA improperly ignored the results of the neuropsychological testing performed on Plaintiff. At the recommendation of Dr. Natelson, Plaintiff underwent neuropsychological testing in October 2005. (AR 116–128.) After the testing, a "neuropsychological evaluation" was prepared. This evaluation concluded that it would be "impossible for Mr. Salomaa to perform the functions of his position" because his "overall processing speed is slowed," he suffered "impaired ability on tasks of both sustained attention and distractibility," and he had "[d]ifficulty processing and retrieving complex verbal and visual stimuli." (AR 127.) LINA responded to this evaluation by stating that "[a]lthough the neuropsychological testing of November 7, 2005 shows some abnor-

malities, it does not support that those deficits were present during the elimination period." (AR 90.) The Court agrees with LINA.

The neuropsychological evaluation took place in October 2005, seven months after the 210–day elimination period of July 23, 2004 to February 20, 2005. Thus, while Plaintiff is correct that medical reports are "inevitably rendered retrospectively," the neuropsychological evaluation alone is insufficient to establish that Plaintiff's cognitive functioning was impaired during the elimination period. Plaintiff acknowledges the need to establish the impaired cognitive functioning during the elimination period, and contends that these symptoms were documented at various times during and immediately following the elimination period. (Plaintiff's Opening Brief 20:3–8.) But as LINA points out, "none of the many mental health providers who treated and observed [Plaintiff] during the elimination period ever found that he was disabled from cognitive impairment or believed that neuropsychological tests were necessary." (Defendant's Reply Brief 13:17–14:8.) The diagnoses and observations of Plaintiff's condition during the elimination period almost uniformly addressed physical fatigue, with little reference to cognitive impairment. In November 2004, at approximately the midpoint of the elimination period, Dr. Ehlers noted that Plaintiff was "mentally alert" but that his "body remains fatigued." (AR 429.) On September 27, 2004, Dr. Harris Halpern described Plaintiff as possessing above average intelligence and insight and "[zero] judgment problems." (AR 434.) Even the observations of Dr. Andersen, who was specifically assessing Plaintiff for signs of CFS, are generally confined to symptoms of physical exhaustion. (AR 278, 225, 196.) When Dr. Andersen did identify symptoms related to cognitive functioning, they were based on Plaintiff's self-reporting. (AR 278, 225.)

After considering the content and context of the neuropsychological evaluation, the Court finds that while the evaluation was entitled to some weight, LINA did not abuse its discretion in deeming it insufficient to establish Plaintiff's total disability during the elimination period.

## DISPOSITION

The Court is sympathetic to the difficulties Plaintiff describes. They are similar to the plights of many burdened by CFS, and of others struggling to cope with the evolving demands of a modern workplace. The Court's holding in this case should not be construed as finding that Plaintiff does not suffer from CFS, or that this condition has not adversely impacted his quality of life.

The Court's holding here goes no further than to find that based on the administrative record, LINA's decision to deny LTD benefits to Plaintiff was not an abuse of discretion. The Court has modified its application of the abuse of discretion standard in this case to reflect evidence that LINA's determination to deny benefits may have been influenced by a conflict of interest. But even under this modified standard, "abuse" is still a powerful word which the Court does not take lightly. LINA had a duty to give fair and full consideration to Plaintiff's evidence, but the lack of objective evidence regarding Plaintiff's ability to perform the material duties of his regular occupation provided a reasonable basis for the denial. The denial of Plaintiff's application for LTD benefits is therefore **AFFIRMED.**

IT IS SO ORDERED.